## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SOUTHDOWN, INC. and SOUTHDOWN ENVIRONMENTAL TREATMENT SYSTEMS, INC., | ] ] ] ] | |
| Plaintiff(s), | ] ] | CV-96-N-3300-S |
| vs. | ] ] | **ENTERED** |
| LESLIE S. ALLEN, | ] ] | AUG 18 1997 |
| Defendant(s). | ] | |

**Memorandum of Opinion**

**I.   Introduction.**

Plaintiffs, Southdown, Inc. and Southdown Environmental Treatment Systems, Inc. ("SETS") (collectively, "Southdown"), bring this action alleging that certain real property they purchased from the defendant, Leslie S. Allen ("Allen"), was contaminated by the defendant through the improper disposal of hazardous waste materials. They assert claims under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), and the common law of the State of Alabama, and seek to recover past and anticipated expenditures which they claim have and will result from the contamination.

The case is presently before the court on the defendant's January 29, 1997, motion to dismiss the plaintiffs' claims for negligence and abnormally dangerous activities pursuant to Federal Rule of Civil Procedure 12(b)(6). The motion also originally contained within it a motion for partial summary judgment on the plaintiffs' claims for fraudulent

32

misrepresentation and fraudulent deceit pursuant to Federal Rules of Civil Procedure 56 and 12(c). The court entered a memorandum of opinion and order on March 13, 1997, by which it held that the applicable period of limitations does not bar the plaintiffs' claims for negligence and abnormally dangerous activities. *March 13, 1997, Memorandum of Opinion* at 2-3. The court also denied the motion for partial summary judgment. *Id.* at 4-5. The pending motion to dismiss has been briefed by the parties and, upon due consideration, will be granted.

## II.   **Standard of Review.**

For purposes of ruling on a motion to dismiss, the court must take the allegations of the complaint as true and construe them in a manner most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts . . . which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A complaint may be dismissed when the allegations demonstrate that the plaintiff does not have a claim. *Bruce v. Wade*, 537 F.2d 850, 852 (5th Cir. 1976); *Hepperle v. Johnston*, 544 F.2d 201 (5th Cir. 1976).

## III.   **Allegations of the Complaint.**

After enactment of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), in October of 1976, the defendant, along with Michael Hollingsworth ("Hollingsworth") and N. C. Black ("Black"), incorporated and became the sole shareholders and directors of All-Worth Enterprises, Inc. ("AWE"), an Alabama corporation formed to, among other things, reclaim, treat, store, and otherwise handle solvents,

2

chemicals, emulsions, degreasers, and other industrial wastes. Allen served as President of AWE. In April 1978, Black entered into a lease agreement with the Industrial Development Board of Tarrant City, Alabama, pursuant to which Black leased, with an option to purchase, real and personal property located at 500 Medco Road, Birmingham, Alabama (the "site"). The site is part of an industrial park that was constructed between 1977 and 1978 on previously undeveloped agricultural land. In October 1978, AWE subleased the site from Black for use as a hazardous waste management facility.

The site became operational in 1978 with Allen acting at all times as supervisor. AWE provided waste management services on the site, including solvent recycling of generator waste solvent for reuse by the particular generator or by others; removal of waste sludges, solids, and liquids for blending into liquid waste fuels used by industrial furnaces; and processing of solid waste into a solid fuel used by cement kilns. As part of the site's waste management process, it contained several storage tanks that held spent industrial solvents prior to recycling and contained an evaporator that heat dried and recovered spent industrial solvents that were pumped from the storage tanks. Operation of the evaporator produced wastes, including still bottoms, and a waste brine emulsion containing both chlorinated and nonchlorinated solvents.

In February 1982, Hollingsworth sold his shares of stock in AWE to the corporation and resigned as an officer and director, leaving Allen and Black as the sole shareholders and directors. In October of 1983, the United States Environmental Protection Agency issued to AWE a RCRA Part B permit to operate the site as a hazardous waste tank and container storage facility. Similarly, in November of 1983, the Alabama Department of

Environmental Management issued to AWE a State Part B permit allowing the same activity. Both permits became effective on November 30, 1983, and were to remain in effect, as modified, until November 30, 1993.

In June of 1985, AWE changed its name to Allworth, Inc. ("Allworth"). Thereafter, in December of 1986, Black sold his shares to the corporation and resigned as an officer and director, leaving Allen as the sole shareholder, director, and officer. Simultaneously, Black granted Allen the option to purchase the site, and Allen subsequently exercised that option.

In September of 1990, plaintiff SETS and Allen entered into an agreement (the "Allen agreement") pursuant to which SETS acquired from Allen, among other things, the capital stock of Allworth and title to the site. Under Sections 1.4 and 3.12(c) of the Allen agreement, Allen represented that, except as allowed by the relevant permits and to defendant's actual or imputed knowledge, "no solid or liquid wastes of any kind or character have ever been deposited or disposed of on or in the Real Property" comprising the site. *Complaint* at 5. Similarly, under Sections 3.8(c)(ii) and 3.8(c)(vii), Allen represented that to his actual or imputed knowledge, "all activities and operations at . . . [the] Facility are being and have been conducted in compliance with the requirements, criteria, standards, and conditions set forth in all applicable federal, state, and local statutes," and that he did "not know of any circumstance, condition or reason which in his judgment is likely to be the basis for revocation or suspension of any of . . . [the] Facility's site assignments, permits, licenses, consents, authorizations, variance or approvals." *Id.* Further, in Section 3.17 of the Allen agreement, Allen represented that Allworth was not "in violation of or default under any law or regulation" and that Allworth "has conducted and

4

is conducting its business . . . in compliance with, and is in compliance with . . . federal, state, and local statutes . . . ." *Id.* at 5-6. In Section 3.28 Allen stated that the representations he had made in the Allen agreement "are complete and accurate . . . ." *Id.* at 6. Finally, pursuant to Section 8.1, at the time of the closing of the acquisition of Allworth, Allen provided a certificate to SETS certifying that "each of his representations and warranties contained in Section 3 of the [Allen] Agreement are true on and as of the Closing Date . . . ." *Id.*

On or after December 22, 1994, the plaintiffs discovered that soil at the site had been contaminated by certain solid and/or liquid wastes not attributable to SETS' operation of the site. Specifically, on December 5, 1994, as part of a potential sale of the site by SETS, Law Engineering, Inc. sampled a limited amount of the site's soil near two solid waste management units ("SWMUs"): the auxiliary loading dock and the tanker loading area. The analysis indicated the presence of several volatile and semi-volatile organic compounds as well as certain metals in the soil near one or both of the targeted SWMUs. The plaintiffs subsequently began negotiations with another potential purchaser of Allworth, Nortru, Inc. ("Nortru"). As part of these negotiations, in March of 1995, Nortru retained Environmental and Safety Designs, Inc. ("EnSafe") to conduct a limited Environmental Site Assessment ("ESA") to assess soil and groundwater quality at particular areas of the site. As part of this ESA, EnSafe collected six representative soil samples at certain areas of the site and three representative groundwater samples. EnSafe gave the results of its assessment to Nortru on April 11, 1995. The ESA indicated, among other things, that fifteen volatile organic compounds and certain metals were present in the subsurface soils at the

site. The ESA also disclosed the presence of eleven volatile organic compounds in the groundwater at the site, nine of which were detected in concentrations that exceed EPA maximum contaminant levels for drinking water. The compounds detected by both Law Engineering, Inc. and EnSafe were typical of those compounds managed at the site while under the ownership and operation of the defendant.

On April 28, 1995, Nortru, SETS, and Southdown Environmental Systems, Inc., a wholly-owned subsidiary of Southdown and parent company of SETS, entered into a stock purchase agreement (the "Nortru agreement") whereby, among other things, SETS conveyed the shares of stock of Allworth to Nortru. SETS, however, assumed all liability relating to soil and groundwater contamination at the site, agreed to indemnify Nortru for any damages suffered as a result of such contamination, and entered into a remediation agreement pursuant to which SETS must, at its sole expense, remediate the contamination to the extent required by the EPA or ADEM. Southdown guaranteed the performance of the obligations assumed by SETS.

In July of 1995, the plaintiffs interviewed several long-term Allworth employees who worked at the site while the defendant was the owner and operator. Those employees advised the plaintiffs that solid and/or liquid wastes were disposed of on and in the ground at the site while the site was operated by Allen. Specifically, the employees stated that, from the start of the facility operations in October 1978 until sometime between 1980 and 1982, site employees routinely drained dryer sludge, or waste brine emulsion, from the site evaporator to the floor in the processing area and then rinsed the emulsion into floor drains that emptied into the soil and drainage ditch adjacent to the processing area. The waste

brine emulsion contained significant quantities of spent chlorinated and nonchlorinated solvents. Further, Allworth employees stated that on several occasions from 1978 until 1980 or 1982, spent solvents overflowed from their storage tanks, escaped the concrete pads under the tanks, and entered the surrounding soils. One Allworth employee asserted that in the mid-1980s, approximately thirty gallons of spent solvents were spilled at the site's tanker loading area and a portion of this spill entered the soils and the drainage ditch.

The compounds detected in the soil and groundwater at the site are "hazardous substances" as defined or listed by CERCLA § 101(14), 42 U.S.C. § 9601(14), are "solid wastes" as defined or listed by RCRA § 1004(27), 42 U.S.C. § 6903(27), and may be "hazardous wastes" as defined or listed by RCRA § 3001, 42 U.S.C. § 6921. The plaintiffs therefore allege that Allen's representations that no solid or liquid wastes of any kind were ever deposited or disposed of on or in the site and that site activities had always complied with all applicable statutory, regulatory and permit requirements were false.

On June 9, 1995, pursuant to SETS's agreement with Nortru, Southdown prepared a RCRA Facility Investigation Work Plan ("RFI Work Plan") and submitted it to ADEM for agency approval. On November 6, 1996, ADEM approved the RFI Work Plan, and on December 2, 1996, EnSafe began implementing the approved plan. The plaintiffs assert that as a direct consequence of the soil and groundwater contamination that occurred during Allen's ownership and/or operation of the site, they have incurred losses and costs of approximately $300,000, as well as the diminution in value of the site at the time it was conveyed to Nortru.

### IV.     Defendant's Failure to Answer Five of Nine Counts.

As a threshold matter, the plaintiffs assert in their response to Allen's original motions to dismiss and for partial summary judgment that the motions address only four of the nine counts brought against the defendant.[1] Allen's answer was due on January 28, 1997, but he has thus far failed to file it. The plaintiffs therefore state that, pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, the court should find the defendant in default on the remaining five (now six) unanswered counts. *Plaintiff's Response in Opposition to Defendant's Motion to Dismiss* at 1 n. 1.

A limited number of district courts have held that a defendant who makes a motion pursuant to Rule 12 of the Federal Rules of Civil Procedure directed only to particular claims must nevertheless file a responsive pleading to the remaining claims. *See, e.g., Gerlach v. Michigan Bell Tel. Co.*, 448 F. Supp. 1168 (E.D. Mich. 1978). This court, however, disagrees with such a holding. Accordingly, the defendant's motions to dismiss and for partial summary judgment act to suspend his obligation to answer the remaining six of plaintiffs' claims.

## V.     Discussion.

The defendant has moved to dismiss the Alabama state law claims for negligence and abnormally dangerous activities pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Allen asserts that these tort claims are due to be dismissed because the plaintiffs seek only economic damages, an insufficient basis to support an action in tort. *Defendant's Motion to Dismiss* at 4.

---

[1] Since the time the plaintiffs filed their response, they filed an amended complaint, adding an additional count.

### A. Economic Damages As a Basis For Tort Action.

The defendant contends that the plaintiffs' negligence and abnormally dangerous activities claims fail as a matter of law because they seek purely economic damages. Allen claims that economic damages cannot be the basis for a tort action, relying on Alabama law's adoption of what some states call the "economic loss rule." *Defendant's Motion to Dismiss* at 4. This rule holds that claims for damages to property caused by some defect or malfunction in that property may lie in contract only and not in tort. *See Lloyd Wood Coal Co. v. Clark Equipment co.*, 543 So. 2d 671, 674 (Ala. 1989); *Dairyland Ins. Co. v. General Motors Corp.*, 549 So. 2d 44, 46 (Ala. 1989).

The plaintiffs respond by asserting that the "Defendant has through negligence and abnormally dangerous activities affected much more than the 'worth' of the Allworth property. More fundamentally, by contaminating the property, Defendant has compromised human health and the environment and caused Southdown to have to investigate and assume responsibility for cleaning up the contamination." *Plaintiffs' Response in Opposition* at 4. The plaintiffs contend that *Dairyland Insurance* is inapposite because in that case, the Supreme Court of Alabama examined the remedies available to a plaintiff in the event that a defective product injures itself. In the instant action, however, the plaintiffs aver that the damage in question is not damage that a defective product has done to itself but rather is the damage done to real property and to the plaintiffs due to the acts of the defendant. The plaintiffs assert that the court in *Dairyland Insurance* recognized this very distinction, holding that a tort claim seeking financial damages from a party acting negligently with respect to a product, and thereby causing damage to that product, could

go forward. 549 So. 2d at 46-47. The plaintiffs further contend that *Dairyland Insurance* does not apply in this case because the alleged damages not only diminished the value of the property but have caused and will continue to cause the plaintiff remediation costs and threaten human health and the environment as well.

Because the Alabama Supreme Court has not yet ruled on the applicability of the economic loss rule to real property, the court entered an order on April 9, 1997, certifying two questions of Alabama law to the Alabama Supreme Court: (1) Is a commercial real property purchaser's claim in tort for damages for diminished property value caused by environmental contamination existing at the time of sale and resulting from the negligence and/or abnormally dangerous activities of the prior owner barred by the economic loss rule?; and (2) Is a commercial real property purchaser's claim in tort for damages for remediation costs caused by environmental contamination existing at the time of sale and resulting from the negligence and/or abnormally dangerous activities of the prior owner barred by the economic loss rule? The Alabama Supreme Court, on May 9, 1997, declined to answer the certified questions. The court, therefore, now must tread uncharted waters, predicting, as best it can, how the Alabama Supreme Court would answer the questions presented, were it to do so.

### 1.  Economic Loss Rule in Alabama.

The Alabama Supreme Court in *Lloyd Wood Coal Co. v. Clark Equipment Co.* held that when a commercial product malfunctions or is defective and such malfunction or defect causes damage only to the product itself, the owner of the product may not bring a tort action. 543 So. 2d 671, 671 (Ala. 1989). Instead, the cause of action lies in contract.

*Id.* at 673. In adopting the so-called "economic loss rule," the court stated it had been "persuaded by the rationale" of the United States Supreme Court as expressed in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986).

In *East River*, the Court recognized that states have resolved the issue in three ways. First, some states have adopted the "majority land-based approach, " holding that if a defective product causes purely monetary harm to itself, the owner has no tort basis for a cause of action. *Id.* at 868. Alternatively, other states have embraced the "minority land-based approach," holding that tort law always encompasses injury to the product itself because economic loss as well as personal and property damage are all proximately caused by the defendant's conduct. *Id.* at 868-69. Finally, some states take an intermediate approach whereby an endangered user may sue in tort for damages to the product itself, while a mere disappointed user may not. *Id.* at 869-70. The Alabama Court adopted the majority approach, finding the intermediate and minority positions "unsatisfactory." *Id.* at 870-71. It stated that "[t]he intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior." *Id.* at 870. It felt that "[t]he minority view fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." *Id.* at 870-71. In contrast, the majority approach distinguishes between the discrete realms of tort and contract law, recognizing that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* at 871. The Court stated,

11

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*Id.* at 872-73 (internal citations and footnote omitted).

Two months after the Alabama Supreme Court rendered its decision in *Lloyd Wood Coal*, it recognized an exception to the economic loss rule. In *Dairyland Ins. Co. v. General Motors Corp.*, 549 So. 2d 44 (Ala. 1989), the plaintiff's insured purchased a van from a car dealer. Shortly thereafter, the van's lights began to blink on and off. The purchaser returned the van to the dealer for repair. Approximately one week later, the van caught fire while the owner was driving it, and the vehicle was totally destroyed. *Id.* at 45. A fire investigator subsequently reported that a short in the electrical system beneath the dashboard caused the fire. *Id.* at 45-46. The owner's insurance company brought suit, alleging, *inter alia*, negligent manufacture and negligent repair on the part of the dealer. The trial court granted the defendants' motion for summary judgment. *Id.* at 46. On appeal, the Alabama Supreme Court restated the economic loss rule established in *Lloyd Wood Coal* and held that the negligent manufacture claim was barred by that doctrine. *Id.* The court reversed the trial court with regard to the negligent repair claim, however, allowing the claim to go forward. *Id.* at 46-47.

While the court did not explain its rationale for recognizing an exception to the economic loss rule in *Dairyland Insurance*, its opinion in *Money v. Precision Am. Corp.*,

583 So. 2d 241 (Ala. 1991), sheds some light on the issue. In *Money*, the purchaser of a tree harvester questioned personnel employed by the seller regarding maintenance. The employees allegedly advised the plaintiff to continue running the engine without performing any maintenance. The harvester subsequently broke down, and the seller refused to cover the costs of repair. The plaintiff brought, *inter alia*, a claim for negligent instruction regarding maintenance. *Id.* at 242. The court stated that the *Money* negligence claim was different than that rejected by the United States Supreme Court in *East River*. "In *East River*, the negligence allegedly occurred during the manufacture of the turbines," whereas in *Money*, the alleged negligence did not happen until after the product had been manufactured. *Id.* at 242-43. The court then opined that this distinction made the *Money* facts similar to those in *Dairyland Insurance*. *Id.* at 243.

### 2. **Application of the Economic Loss Rule.**

Upon consideration of the current status of Alabama law with regard to the economic loss rule, the court discerns no reason to believe that the Alabama Supreme Court would not apply the economic loss rule to real property as well as to tangible items of personal property. Contract and warranty considerations are present in transactions regarding both. The parties in both situations are equally able to provide for unexpected contingencies through their negotiations, as they did in this case. Application of the rule would seem to bar the plaintiffs' tort claims for damages.

The plaintiffs contend, however, that the defendant's contamination of the subject property has "affected much more than the 'worth of' the . . . property. More fundamentally, . . . Defendant has compromised human health and the environment and

13

caused Southdown to have to investigate and assume responsibility for cleaning up the contamination." *Plaintiffs' Response in Opposition* at 4. The plaintiffs thus argue that the economic loss rule, even if it does apply to real property, does not bar their claims because the injury suffered was not merely to the "product," or in this case, the land, itself. *Id.* The court is not persuaded. The investigative and remediation costs Southdown allegedly has and will continue to incur flow directly from the fact that the plaintiffs knowingly purchased property on which hazardous activities had previously occurred, relying on the representations of Allen and without first making their own independent inspections and assessments. In essence, the parties negotiated for terms to cover possible contamination of the real property in question. They can hardly be heard to complain now that the terms of the contract which plaintiffs deemed adequate at the time of their negotiation have proved inadequate.

Also, the plaintiffs argue that their claims fall within the exception to the economic loss rule recognized by the Alabama Supreme Court in *Dairyland Insurance*. *Id.* at 6. They assert that "the damage in question . . . is not damage that a defective product has done to itself. Rather, it is the damage done to real property and to Southdown . . . , due to the acts of another, Defendant Allen." *Id.* While this argument is attractive on its face, it is unpersuasive. In *Dairyland Insurance*, the van purchaser, after buying the vehicle, returned at a later date to the seller for repairs to the lighting system. These subsequent repairs were allegedly performed in a negligent manner and caused a fire that destroyed the van. The repair was not part of the original contract for sale between the purchaser and the dealer. Similarly, in *Money*, the plaintiff brought a claim for negligent instruction with

regard to maintenance that he received after he purchased the tree harvester. In contrast, the instant case presents facts demonstrating that any negligent conduct of Allen occurred *prior* to the sale of the property to Southdown. Thus, the injury to the property that may have resulted from Allen's conduct had already occurred before the sale and were contemplated by the terms of the contract itself. The facts here are distinguishable from those presented to the Alabama Supreme Court in *Dairyland Insurance*, which relied upon post-contract conduct of the defendant.

## VI. Conclusion.

Alabama's economic loss rule bars the plaintiffs' claims for negligence and abnormally dangerous activities, and the claims will be dismissed. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 15th of August, 1997.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE