**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**



IN THE MATTER OF:

SOUTHDOWN, et al.,

v.                                                  CASE NO.: CV-96-J-3300-S

LESLIE S. ALLEN, et al.,

<u>**MEMORANDUM OPINION**</u>

Pending before the court are third party defendants, Nortru, Inc.(Nortru) and

Allworth, Inc.'s (Allworth) motion for partial summary judgment (doc. 752) and

plaintiffs' cross-motion for partial summary judgment (doc. 763).[1] Both Nortru and

plaintiffs have filed briefs in support of and in opposition to their respective motions.

The Customer defendants listed below[2] (Customer defendants) have filed a brief in

---

[1]Nortru purchased the Allworth stock from Southdown, who purchased the Allworth corporation. Defendant Les Allen was an employee and president of Allworth. Although Nortru today owns Allworth, for the sake of simplicity, the court shall refer to "Nortru" to mean the entity which purchased the Allworth stock, although the site in question is referred to by all the parties as "the Allworth site." "Allworth" as used here, denotes the ongoing business concern and site, currently owned and operated by Nortru. Although Nortru and Allworth have filed joint pleadings, references to these will be denoted solely as "Nortru." Nortru is actually a wholly-owned, indirect subsidiary of Philip Environmental, Inc. *See* Stock Purchase Agreement at 1.

[2]Alabama Power Company; Akzo Nobel Coatings, Inc.; Amana, Co., LP; American Buildings Company; American Brass; Anderson Hickey Co.; LeGrange Plastics Co./Automotive Moulding Co.; Ball Corporation; Bell South Telecommunications, Inc.; Brunswick Corp. (d/b/a Roadmaster); Bryce Corporation; Caldwell Chemicals Coatings Corp.; Calsonic North America, Inc.; Catalytic Inc. c/o Raytheon Co.; Chattem, Inc.; Chemical Waste Management, Inc.; Coltec Industries, Inc.; Conopco, Inc.; Copeland Corporation; Coronado Paint Company; Crown Metro Chemicals, Inc.; Cummins Power Generation Corp.; D.C.P.; Lohja, Inc.; Decatur Aluminum Corp.; Delta Air Lines, Inc.; Dexter Corporation; Egyptian Lacquer Mfg. Co.; Ethyl Corporation; Federal-Mogul Corporation; Flint Ink Corporation; Ford Motor

support of Nortru's motion for partial summary judgment as has defendant Allen. Additionally, customer defendants Silgan Containers Manufacturing Corporation ("Silgan"), Carboline Company, Sanderson Plumbing Products, Inc., Master Lock Company, and Kimoto Tech, Inc., have joined in the brief filed by Listed Customer defendants in support of Nortru's motion.

Additionally, by order of August 24, 2000 (doc. 767) the court allowed the parties to file briefs regarding two issues raised by the Customer defendants in their arguments supporting Nortru's motion, namely that "Southdown seeks reimbursement of the clean up costs from the Customer defendants, who in turn are entitled to indemnification from Allworth who is thus indemnified by Southdown" and that "plaintiff failed to conduct an environmental study of the property at the time of its purchase of the property...[potentially barring] any claim by plaintiff that it did not

---

Company; Freightliner Corporation; General Motors Corporation; Gerber Products Company; Great Lakes Chemical Corporation; Greif Bros. Corporation; H. B. Williamson Company; Harris Semiconductor, Inc.; Hoover Materials Handling Group, Inc.; Imperial Adhesives, Inc.; International Flavors & Fragrances, Inc.; International Paint, Inc.; ITT Industries, Inc.; JVC America, Inc.; Kaiser Aluminum Corp.; Kraft Foods, Inc.; Lockheed Martin Corp.; Martin Electronics, Inc.; MBCI (d/b/a Metal Coaters of Georgia, Inc.); MCF Environmental; McKechnie Vehicle Components, Inc.; Minnesota Mining and Manufacturing Co.; Morton International, Inc.; Mueller Brass Company; Murray, Inc.; Nissan Motor Manufacturing Corporation U.S.A.; Norandal USA Inc.; Paccar, Inc.; Parker-Hannifin Corp.; Peavey Electronics Corporation; Peek Pavement Markings, Inc.; Peerless Coatings, Inc.; Plus Mark, Inc.(American Greetings); Potomac Environmental, Inc.; Precision Printing and Packaging, Inc.; Quantegy, Inc.; RAI, Inc.; R.R. Donnelley & Sons Company; SICPA Securink Corporation; Sheboygan Paint Company, Inc.; Sirco Systems LLC; Sony Magnetic Products, Inc. of America; Steelcase, Inc.; SCI Systems, Inc.; SVI Corporation; Sun Chemical Corporation; The Kent Corporation; The Southern Company; Tennessee Technical Coatings Corporation; Tennsco Corporation; Thyssen Dover Elevator Company; TM Marine Group, LLC; Union Carbide Corporation; Van Leer Containers, Inc.; Vermont American Corp.; Westvaco Corporation; Wilson Sporting Goods Co.; and Wolverine Tube, Inc.

contaminate the property for lack of evidence." All parties have responded to the Order of August 24, 2000.

For the reasons stated below, the court does find that Nortru's motion for partial summary judgment is due to be **GRANTED**, and the Southdown plaintiffs' motion for partial summary judgment is due to be **DENIED**.

## I. <u>Factual Background</u>

The court finds the following to be the undisputed facts in this case:

1. From September 1990 until April 1995, the Southdown plaintiffs owned all of the issued and outstanding shares of common stock of Allworth.[3] Southdown plaintiffs' Seconded Amended Complaint, ¶¶ 56, 69.

2. Allworth operated and continues to operate a hazardous waste recycling facility located at the Site, whose address is 500 Medco Road, Birmingham, Alabama. *Id.* at ¶ 49.

3. In December, 1994, Law Engineering, Inc., an environmental consultant retained by the Southdown plaintiffs, provided the Southdown plaintiffs with the

---

[3]Plaintiffs Southdown, Inc. and Southdown Environmental LLC ("SELLC") are the current plaintiffs to this action. *See* brief in support of plaintiffs' cross-motion (Aug. 15, 2000); and Complaint of December 20, 1996 (doc. 1). The underlying Stock Purchase Agreement was entered by Southdown Environmental Treatment Systems, Inc. ("SETS"), and Southdown Environmental Systems, Inc. ("SES"). Of these, only SETS signed the Remediation Agreement. On May 26, 2000, the plaintiffs filed a substitution of parties stating that on December 31, 1999, SETS merged into SELLC, which is its successor (doc. 695). Southdown, Inc., guaranteed the obligations of its affiliates under the Agreements. *See* Stock Purchase Agreement at § 6.1(p). For convenience, the court shall refer to all of these plaintiffs as "Southdown" or "the Southdown plaintiffs."

results of soil samples taken at Site. The results indicated the presence of several volatile and semi-volatile organic compounds in the soil at the Site, including acetone, 2-butanone, 1,1-dichloroethane, 1,1-dichloroethene, cis-1,2-dichloroethene, ethylbenzene, methylene chloride, 4-methyl-2-pentanone, tetrachloroethene, toluene, 1,1,1-trichloroethane, trichloroethene, xylenes, benzo[b]fluoranthane, bis [2-ethylhexy] phthalate, butyl benzyl phthalate, chysene and pyrene, as well as certain metals. Law Engineering, Inc. provided these results to the Southdown plaintiffs no earlier that December 22, 1994. *Id.* at ¶ 64.

4. In early 1995, Nortru commenced negotiations with the Southdown plaintiffs concerning the purchase of the stock of Allworth. *Id.* at ¶ 65.

5. Nortru hired Environmental and Safety Designs, Inc. ("Ensafe") to perform a limited Environmental Site Assessment (ESA) at the Site to determine soil and groundwater quality. Ensafe took soil samples at nine locations and drilled groundwater monitoring wells at three of these locations. *Id.* at ¶¶ 65-66.

6. In April 1995, Ensafe provided Nortru with a written report documenting the results of its ESA. Ensafe documented that the Site was contaminated with hazardous substances. The report noted, *inter alia,* the presence of fifteen volatile organic compounds in the subsurface soils at the Site, including acetone, methyl ethyl ketone, bromodichloromethane, 1,1-dichloroethane, 1,1-dichloroethene, 1,2- dichloroethene

4

(total), ethyl benzene, methyl isobutyl ketone, methylene chloride, perchloroethylene, toluene, 1,1,1-trichloroethane, 1,1,2-trichlorothane, trichloroethene, and xylenes, as well as the semi-volatile organic compounds m.p-methylphenol and bis 2-ethylexylphthalate, and certain metals.  The report also found that eleven volatile organic compounds were present in the groundwater at the Site, including acetone, 1,2-dichloroethane, 1,1-dichloroethene, 1,2-dichloroethane (total), methylene chloride, perchloroethylene, toluene, 1,1,1-trichloroethane, trichloroethene, vinyl chloride, and xylenes.  Of these eleven volatile organic compounds in the groundwater, nine were present in concentrations above U.S. EPA's maximum contaminant levels for drinking water.  *Id.* at ¶ 67.[4]

7. On April 28, 1995, Nortru and the Southdown plaintiffs entered into a Stock Purchase Agreement, pursuant to which, among other things, the Southdown plaintiffs conveyed the shares of stock of Allworth to Nortru.  *Id.* at ¶ 69.

8.   On April 29, 1995, Nortru and the Southdown plaintiffs entered a Remediation Agreement as an express condition precedent to Nortru's entry into the Stock Purchase Agreement.  Stock Purchase Agreement, Art. 6.1(q).

---

[4]The court notes that the Southdown plaintiffs did not adopt this paragraph of undisputed facts from Nortru's brief, referring to their answer to Cross-Claims ¶ 13. *See* Plaintiffs' brief at 2. However, the same plaintiffs allege facts identical to those stated in paragraph 6 above in their Second Amended Complaint at ¶ 67.

9. Southdown, Inc. guaranteed the performance of the Southdown plaintiffs' obligations pursuant to the Stock Purchase Agreement and Remediation Agreement. *Id.,* Art. 6.1(p).

10. Article 2.1 of the Remediation Agreement provides:

> SETS shall, at its sole expense (which expense shall include, but is not limited to, all costs relating to preparation of the Plan or Plans, responding to and compliance with any Order, the cost of all contractors to perform the Work or the requirements of the Plan or Plans or any Order and any costs assessed by any of the Agencies for oversight of the Work), remediate (i) all known Contamination located on the Real Property or on contiguous property where the source of Contamination is on or originated from the Real Property, and (ii) all previously unknown Contamination discovered on the Real Property, or on contiguous property not owned by Rho-Chem or Allworth where the source of Contamination is on or originated from the Real Property, during the course of remediating known Contamination, each to the extent required by the Agencies.[5]

11. Article 3.1 of the Remediation Agreement further provides:

> <u>Indemnity by SETS.</u> To the fullest extent permitted by law, SETS agrees to indemnify, defend and hold harmless Purchaser and its agents and employees, from and against any and all liabilities, costs, expenses (including attorneys' fees), claims, demands, judgments, losses or damages on account of injury, disease or death to any person, including SETS' and Purchasers' employees, or damage to property, or any type of loss or damage whatsoever arising out of or

---

[5]Rho-Chem Corp. is a subsidiary of Southdown and a party to the Remediation Agreement. Remediation Agreement at 1; Stock Purchase Agreement at 1.

in connection with the performance or breach of any obligation hereunder by SETS and its employees, contractors, suppliers, and agents, except to the extent that SETS [sic, should be Purchaser] contributed to the claim, loss, damage, injury or liability.

12.   Article 11.2 of the Stock Purchase Agreement states as follows:

> Indemnification of the Purchaser. The Sellers shall defend, indemnify and hold the Companies [Allworth among others] and the Purchaser [Nortru] and their respective affiliates harmless from and against any and all damages suffered by the Companies or the Purchaser or any affiliate thereof as a result of, caused by, arising out of, or in any way relating to...(v) without limitation as to time, the Environmental Claims of which sellers are aware listed on Schedule 11.2.

Schedule 11.2 contains a section entitled "Allworth Soil and Groundwater Remediation," which discloses the existence of soil and groundwater contamination at the Site. Article 11.1 of the Stock Purchase Agreement defines "Damages" as "any and all damages, losses, deficiencies, costs, expenses, obligations, fines, expenditures, claims and liabilities, including reasonable counsel fees and reasonable expenses of investigation."

13.   Article 13.6(c) of the Stock Purchase Agreement provides: "In the event of a dispute between the parties in connection with this Agreement, the party against which a judicial or arbitral award is made shall reimburse the prevailing party for all reasonable fees and expenses incurred and paid to said counsel for such service."

7

14. Article XII NONCOMPETITION COVENANT of the Stock Purchase Agreement provides: "Sellers understand and acknowledge that a portion of the value of the Shares, ... is attributable to business relationships between the Companies and key customers of the Companies ...."

15. On or about December 20, 1996, the Southdown plaintiffs filed a complaint in this court against defendant Allen, the individual who sold the Allworth stock to the Southdown plaintiffs. The complaint seeks to recover the costs of remediating the contamination at the Site.[6] Southdown Plaintiffs' Second Amended Complaint, ¶¶ 86, 87.

16. Defendant Allen filed a third party complaint on or about February 4, 1998 against Allworth and Nortru. Allen alleged that Allworth is required to indemnify Allen for any liability that Allen might sustain vis-a`-vis the Southdown plaintiffs. Defendant Allen also alleged that Allworth and Nortru are liable for contribution pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f). Allen Third party Complaint, ¶¶ 9, 16, 23.

17. On or about October 15, 1998, the Southdown plaintiffs amended their complaint to name 41 former and current Allworth customers as third party defendants. The Southdown plaintiffs alleged that the 41 customers are liable for

_____

[6]For a complete listing of Southdown's pending claims, see the Procedural History Section, *infra* at II.

contribution pursuant to § 113(f) of CERCLA.  Southdown Plaintiffs' Second Amended Complaint,¶¶ 91, 93.

18. On or about December 9, 1998 defendant Allen filed a cross-claim against the same 41 former and current Allworth customers.  Allen alleged that the 41 customers are liable for contribution pursuant to § 113(f) of CERCLA.  Allen Cross-Claim ¶ 45.

19. On or about February 1, 2000, the 41 third party Customer defendants filed a third party complaint against an additional 139 former and current Allworth customers.  The 41 third party Customer defendants alleged that the 139 additional customers are liable for contribution pursuant to § 113(f) of CERCLA, as well as for unjust enrichment.  Third party Complaint of Customer Defendants, ¶¶ 36, 46.

20. The following correspondence between Nortru and the Southdown plaintiffs has been exchanged during the pendency of this action:  Letter from Marlys Palumbo to Patrick Bullard, dated March 13, 1998; Letter from Marlys Palumbo to Leslie White, dated June 8, 1998; Letter from Deborah Huston to Patrick Bullard and Leslie White, dated April 21, 1999; and Letter from Jeffrey S. Bromme to Dennis M. Thies and Leslie White, dated May 26, 2000.

The pending motions ensued.  Attached as Exhibits 1 and 2 to the brief the Southdown plaintiffs filed in support of their cross-motion for partial summary

judgment are affidavits of plaintiffs' counsel.[7] Both of these affiants state, in essence, that they did not intend for the term "sole expense" to actually mean sole expense, but rather, this term was meant to refer only to the rights and obligations between the parties to the Remediation Agreement. The court notes that this issue is very much disputed, thus, the facts set forth in these two affidavits are not included in the court's recitation of the undisputed facts of this case.

## II. **Procedural History**

On December 20, 1996, plaintiffs Southdown, Inc., and Southdown Environmental Treatment Systems, Inc. (hereinafter referred to as "Southdown" or the "Southdown plaintiffs") filed a complaint (doc. 1) against Leslie Allen, an individual, who was, at one time, the sole shareholder and director of Allworth, Inc., as well as the President and Secretary of that corporation. Complaint at 2. The Southdown plaintiffs allege that they "recently discovered" the hazardous waste site they acquired from Allworth, Inc. was contaminated and that defendant Allen concealed such contamination.[8] Complaint at 1. The complaint states causes of action for CERCLA

---

[7]Neither of these counsel are listed as trial counsel in this case. Patrick Bullard, the affiant in Exhibit 1, states he has been General Counsel to the plaintiffs since August, 1995. From 1992 until 1995, he served as counsel for plaintiffs as an attorney in the firm of Bracewell and Patterson, L.L.P., in Houston, Texas. Exhibit 1 to plaintiffs' cross-motion at ¶ 2. Similarly, John L. Keffer states from 1991 until 1998 he was a partner with the firm of Bracewell and Patterson, L.L.P. and served as counsel for plaintiff. Exhibit 2 to plaintiffs' cross-motion at ¶ 2.

[8]The Southdown plaintiffs state "[a]lthough plaintiffs are not responsible for the contamination, they alone have undertaken remedial investigative efforts at the site ..."

Section 107(a)(2) Cost Recovery (Count I); CERCLA Section 113(f) Contribution (Count II); CERCLA Section 113 (g)(2) Declaratory Judgment (Count III); various forms of fraud (Counts IV – VI); negligence (Count VII); abnormally dangerous activity (Count VIII); and public nuisance (count IX).

The Southdown plaintiffs filed a first amended complaint on April 9, 1997 (doc. 17). This complaint kept Counts I, II and III from the original complaint, and added the following: RCRA Section 7002(a) Citizen Suit against defendant Allen (Count IV); fraud claims against defendant Allen as in the original complaint (Counts V – VII) and negligence, abnormally dangerous activity and public nuisance as in the original complaint (Counts VIII -- X).

The court entered an Order dismissing the Southdown plaintiffs' claims for negligence and abnormally dangerous activity on August 18, 1997 (doc. 33).

Defendant Allen filed an answer and counterclaim against the Southdown plaintiffs on August 28, 1997 (doc. 36). An amended counterclaim replacing and superceding the August 28, 1997 pleading was filed by defendant Allen on September 24, 1997 (doc. 43). This counterclaim alleges that the Southdown plaintiffs should be wholly liable based on the theory that they were the owners of the facility at the time of the contamination. Defendant Allen also filed a third party complaint on February 4, 1998, stating that he is entitled to indemnification by Allworth as

11

Allworth's agent (Count I) and that he is entitled to CERCLA § 113(f) contribution by Allworth (Count II) and Nortru (Count III).

On October 14, 1998, the Southdown plaintiffs filed a second amended complaint (doc. 96), bringing in forty-one defendants (referred to by the Southdown plaintiffs as "generator/arrangers") who allegedly arranged for disposal or treatment of waste at the Allworth facility. This complaint kept Counts I and II from the previous complaints, and added the following: CERCLA section 107(a)(3) cost recovery from generator/arranger defendants (Count III); CERCLA Section 113(f) contribution from generator/arranger defendants (Count IV); Declaratory Judgment as to all defendants (Count V); RCRA Section 7002(a) Citizen Suit against defendant Allen (Count IV); fraud claims against defendant Allen as in the original complaint (Counts VII – IX) and public nuisance against defendant Allen (Count X).

On October 14, 1998, this case was reassigned to the undersigned judge (doc. 97).

Defendant Allen filed an answer and counterclaim, cross-claims, and third party claims on December 10, 1998, in response to the second amended complaint (doc. 108). Defendant Allen counterclaims that based on relative conduct, the Southdown plaintiffs should bear the full expense of any response costs incurred. Defendant Allen's third party complaint brings in third party defendants Nortru, Inc. and

12

Allworth, Inc.  Allen states claims for indemnification as Allworth's agent (Count I); CERCLA § 113(f) and contribution by Allworth and Nortru (Counts II-III).  Allen also cross-claims against the same forty-one defendants ("Listed Customer defendants") sued by the Southdown plaintiffs in its second amended complaint for contribution under § 113(f) of CERCLA.  The Listed Customer defendants filed counterclaims against the Southdown plaintiffs and cross-claims against defendant Allen (doc. 394) on February 1, 2000.  The Listed Customer defendants sue the Southdown plaintiffs and defendant Allen for breach of contract (Count I); indemnification (Count II); a third party beneficiary claim (Count III); and fraud (Counts IV-V).

Listed Customer defendant Steelcase, Inc., then filed a separate third party complaint (doc. 395) against Research Solvents and Chemicals, Inc., for contribution under CERCLA § 113(f) (Count I); declaratory judgment (Count II); breach of contract (Count III); indemnification (Count IV) and unjust enrichment (Count V). Third party defendant Research Solvents and Chemicals, Inc., filed a cross-claim for indemnification against Listed Customer defendant Steelcase, Inc. (doc. 601) on May 3, 2000.

Listed Customer defendant International Flavors and Fragrances, Inc. has also filed a separate third party complaint against Potomac Environmental, Inc., (doc. 396)

for contribution under CERCLA (Count I); negligence (Count II); equitable fraud (Count III); breach of implied warranty (Count IV); unjust enrichment (Count V); breach of contract (Count VI); and indemnification (Count VII).  Listed Customer defendant Elf Atochem filed a notice of claim for indemnification (doc. 397) against the Southdown plaintiffs on February 1, 2000.

That same date, the Listed Customer defendants also filed a third party complaint against eleven third party defendants[9] (doc. 398) for contribution under § 113 of CERCLA (Count I); declaratory judgment under § 113 of CERCLA (Count II); and unjust enrichment (Count III).  Attached to this third party complaint as Appendix 3 are twelve paragraphs listing specific Listed Customer defendants who are not proceeding against one or more of the third party defendants named in Appendix 2. Included as an attachment to this third party complaint is a second third party complaint by Listed Customer defendants against 128 other parties, listed in Appendix 2 to the second third party complaint (also doc. 398).  Attached to this third party complaint as Appendix 3 are fourteen paragraphs listing specific Listed Customer defendants who are not proceeding against one or more of third party defendants named in Appendix 2 to the second third party complaint.

_____

[9]The third party defendants named in this complaint are Aschland Chemical Co.; BellSouth Telecommunications; BF Goodrich Company; Rohr, Inc. (a subsidiary of BF Goodrich); Ford Motor Company; General Electric Co.; Honeywell, Inc.; Parker-Hannifin Corp.; Reynolds Metals Company; Sony Electronics, Inc.; and Union Carbide Corp. *See* Appendix 2 to Listed Customer defendants third party complaint.

Also filed on February 1, 2000 was an amendment to the third party complaint adding Sirco Systems, LLC as a third party defendant (doc. 399). On March 27, 2000, third party defendants Albermarle Corp., Diversified Companies, LLC, and Wabash National were dismissed without prejudice on motion of the third party plaintiffs/Listed Customer defendants (doc. 479). Similarly, third party defendants BF Goodrich and Hanna Chemical coatings were dismissed without prejudice on motion of the third party plaintiffs/Listed Customer defendants on April 11, 2000 (docs. 496 and 536). The third party defendants Hall of Mississippi; World Color Press; Quebecor Printing; Quebecor, Inc., d/b/a/ Ward; and Quebecor, Inc., d/b/a Maxwell were dismissed by the Listed Customer defendants without prejudice (docs. 523 and 542) on April 12, 2000.

Third party defendant Egyptian Lacquer Manufacturing filed a cross-claim against the Southdown plaintiffs and defendant Allen (doc. 503), adopting the Listed Customer defendants' Counterclaims/Cross-claims Against Owner/Operators For Indemnification And State Law Claims, filed February 1, 2000 (doc. 394). Third party defendants Plastech Engineered Products, Inc. (doc. 507); Brunswick Corporation (doc. 509); Tennessee Technical Coatings Corporation (doc. 512); Film Technologies International, Inc. (doc. 517); SCI Systems, Inc (doc. 561); Peek Pavement Marketing, Inc. (doc. 566); Lockheed Martin Corp. (doc. 568); Coronado

Paint Company (doc. 569); International Comfort Products Corp. (doc. 570); ITT Industries (doc. 574); Marine Group LLC (doc. 575); Master Lock Co. (doc. 577); Sun Chemical Corp. (doc. 581); Mack Trucks, Inc. (doc. 586); Carboline Company fka Admiral Paint Co. (doc. 588); Kimoto Tech, Inc. (doc. 590); Alabama Power Company, Sony Magnetics Products, Inc. of America, Delta Airlines, Inc., Peerless Coatings, Inc. and SVI Corp. (doc. 592); Imperial Adhesives. Inc. (doc. 593); BASF Corporation (doc. 595); International Paint, Inc. (doc. 597); H.B. Williamson Co. (doc. 599); Research Solvents and Chemical Company, Inc. (doc. 600); General Electric Company (doc. 606); C.K. Witco, Inc. (doc. 607); Avecia, Inc. (doc. 608); Vermont American Corp. (doc. 609); Hess Oil Virgin Islands Corp. (doc. 610); JVC America, Inc. (doc. 614); The Kent Corp. (doc. 615); Thyssen Dover Elevator Co. (doc. 616); Sirco Systems, LLC (doc. 617); Copeland Corp. (doc. 619); Lucent Technologies, Inc. (doc. 629); Lawter International, Inc. (doc. 630); Rheem Manufacturing Co. (doc. 632); Freightliner Corp. (doc. 635); Decatur Aluminim Corp, (doc. 638); Phifer Wire Products, Inc. (doc. 639); Hager Hinge Company (doc. 644); Crownline Boats, Inc (doc. 645); Essilor of America, Inc. (doc. 650); MBCI d/b/a Metal Coaters of Georgia, Inc. (doc. 658); York Stamping d/b/a Wallace Metal Products (doc. 659); Kaiser Aluminum Corp. (doc. 665); similarly joined in the counterclaims and cross-claims of the Listed Customer defendants'

Counterclaims/Cross-claims Against Owner/Operators For Indemnification And State Law Claims.

Third party defendant Automotive Moulding Company (improperly named as Guardian Automotive Technical Center) filed cross-claims against the Southdown plaintiffs and defendants Allen, Nortru and Allworth (doc. 578) stating similar claims to the Listed Customer defendants.

Third party defendant Utility Trailer Manufacturing Co. filed counterclaims and cross-claims against the Southdown plaintiffs, defendants Allen, Nortru and Allworth, and the added party Philip Services Corp.[10] (doc. 603) on May 3, 2000, in addition to joining in the Listed Customer defendants' counterclaims and cross-claims. Further, Utility Trailer Manufacturing Corp. stated claims for fraudulent misrepresentation (Count 6); third party beneficiary claims regarding promises between defendant Allen and the Southdown plaintiffs and between the Southdown plaintiffs and counter-defendant Philip (Count 7); and negligence (Count 8).

Third party defendant Rehau Inc. filed cross-claims for indemnification (doc. 633) against defendants Allworth and Nortru, d/b/a Philips Environmental with causes of action  for breach of contract (Count I); Indemnification (Count II); and a third-party beneficiary claim (Count III).  Third party defendant Vulcan Industries, Inc.

---

[10]Philip Service Corp. is the parent company of Nortru.

both joined in the Customer defendants' counterclaims and cross-claims as well as stating individual claims against Philip Environmental for Breach of Contract (Count I); Indemnification (Count II); and a third party beneficiary claim pursuant to the stock purchase and remediation agreements between the Southdown plaintiffs and the defendants Nortru and Allworth (doc. 641).

Third party defendant Spartan Electronics Florida, Inc. filed counterclaims against the Southdown plaintiffs and defendant Allen and cross-claims against third party defendant Hazardous Waste Consultants, Inc. ("HWCI") (doc. 657). This pleading includes claims for breach of contract against defendant Allen and HWCI (Count I); indemnification against Allen and HWCI (Count II); a third party beneficiary claim against the Southdown plaintiffs (Count III); and fraud against Allen and HWCI (Counts IV--V).

Third party defendant UAB filed a claim for indemnification and to dismiss (doc. 589) on May 2, 2000. The motion to dismiss was granted (doc. 732).

On May 3, 2000 the third party plaintiffs (Listed Customer defendants) filed a notice that their claims for unjust enrichment against the third party defendants listed in Appendix A to that notice were voluntarily dismissed, in exchange for those parties joining their joint defense group (doc. 620 and Appendix A thereto). This notice also stayed the CERCLA § 113 contribution claims against these third party defendants.

18

The Customer defendants have filed motions for extensions of time in which to file indemnification and state law claims against Nortru and Allworth, due to the stay in effect while the current summary judgment motions are pending. *See e.g.* Stipulated Motion for Extension of Time, filed June 26, 2000.

On October 25, 2000, third party defendant Frisco Manufacturing Company, Inc. was dismissed without prejudice, having filed a bankruptcy petition (doc. 787).

### III. **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coates & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court shall construe the evidence and factual inferences arising therefrom in the light most favorable to the non-moving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest*

*Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987). "The moving party is entitled to judgment as a matter of law if the non-moving party cannot sufficiently show an essential element of the case to which the non-moving party has the burden of proof." *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding Corp.*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 477 U.S. at 251-252. Summary judgment is appropriate where the moving party shows an absence of evidence to support an essential element of the non-moving party's case. *Weiss v. School Board of Hillsborough County*, 141 F.3d 990, 994 (11th Cir. 1998).

## IV. **Legal Analysis**

The issue before the court on the pending cross-motions for summary judgment is the definition of the term "sole expense" as used in the Remediation Agreement

entered into by the Southdown plaintiffs and defendant Nortru,[11] which includes Southdown's alleged obligation to indemnify Nortru from damages arising from environmental conditions at the site.[12] The parties agree that this issue is governed by the substantive law of Texas. Stock Purchase Agreement at ¶ 13.4. The dispute centers on the meaning of "sole" as that term appears in the parties' agreements. The Southdown plaintiffs argue this was only meant to apply as to liability for clean-up of the site between themselves and Nortru and Allworth, whereas Nortru and Allworth argue that "sole" means "to the exclusion of all others."[13] *See* memorandum of Nortru at 12 (July 14, 2000).

*Texas Law of Contracts*

While an ambiguous contract term may create a question of fact for a jury, the determination of whether the terms of a contract are ambiguous is a question of law for the court to decide, looking at the contract in light of the circumstances existing at the time the contract was entered. *U.S. Quest, LTD v. Kimmons*, 2000 WL 1300363

---

[11]Remediation Agreement at ¶. 2.1

[12]Stock Purchase Agreement at ¶ 11.2, Remediation Agreement at ¶ 3.1.

[13]The Southdown plaintiffs also argue that Nortru has no right to be in court because the Stock Purchase Agreement requires the parties to the contract to submit "any controversy or claim" or "any dispute" to mediation. Stock Purchase Agreement at ¶ 13.6. *See* brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at fn.1, and ¶ 10. The court finds that Nortru was brought into this litigation by defendant Allen and should not be barred from defending itself. The court finds that Nortru's presence here is the natural and probable consequence of Southdown's litigation against Allen.

(5th Cir. Sept. 13, 2000), citing *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987).  "A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation." *U.S. Quest, LTD*, 2000 WL 1300363, at 3, citing *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir.1992).

"The ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Gulf Metals Industries, Inc. v. Chicago Insurance Co.*, 993 S.W.2d 800, 808 (Tex. App. 1999); citing *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 521 (Tex. 1995).  A provision or term in a contract will only be held ambiguous when an application of the general rules of contract construction renders the writing capable of at least two reasonable yet different meanings. *Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 147 (Tex. App. 1986).

When a dispute arises from the terms of a contract and the contract is not ambiguous, the court can determine the parties' rights and obligations under the agreement as a matter of law, *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997), and where there is no ambiguity, it is the court's duty to give the words used their plain meaning. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).

Only after a contract is found to be ambiguous may parol evidence be admitted to ascertain the true intentions of the parties expressed in the contract. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex.1996). A contract is ambiguous if, after applying the established rules of construction, it remains reasonably susceptible to more than one meaning. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). Parol evidence cannot be admitted for the purpose of creating an ambiguity.[14] *See Nat'l. Union Fire Ins. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex.1995). *See also Coastal Oil & Gas Corp. v. Roberts*, 2000 WL 1234379 ((Tex. App.) Aug. 31, 2000).

The court finds that Southdown's current claim that nothing in the agreements prohibits their claims against Nortru's customers is belied by their own statements in their pleadings. For example, in their second amended complaint, Southdown states:

> As a necessary condition of Nortru, Inc.'s obligation to purchase the Allworth, Inc. stock, however, SETS assumed all liability relating to soil and groundwater contamination at the site, agreed to indemnify Nortru, Inc. for any damages suffered as a result of such contamination, and entered into a Remediation Agreement pursuant to which SETS must, *at its sole expense*, remediate the contamination to the extent required by EPA or ADEM, and Southdown guaranteed the performance of the obligations assumed by SETS (emphasis added).

---

[14] Although not binding on this Court, the Seventh Circuit has explained that, to be admissible evidence on this issue, "it must be evidence from which an inference about the parties intentions in making the contract can be drawn with considerably greater confidence than if the parties were merely testifying to their private understandings of what the contract meant but failed to say." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 614 (7th Cir.1998).

Second Amended Complaint at ¶ 69, filed October, 14, 1998 (doc. 96).

The court finds that the affidavits submitted by the Southdown plaintiffs as an attachment to their brief in support of plaintiffs' cross-motion for summary judgment (Aug. 15, 2000) were submitted for the purpose of creating an ambiguity.[15] The court makes this finding on the basis of the Southdown plaintiffs' prior representations to this court that the Agreement is not ambiguous, most recently those raised during oral argument before this court. On that occasion, counsel for the Southdown plaintiffs stated that:

> But they say that the Court should look beyond the expressed (sic) terms of the stock purchase agreement or the remediation agreement and go into the surrounding circumstances because lurking somewhere is some motive between Southdown and/or Nortru to protect the customer defendants.
> (A), they didn't plead that; and (B), the expressed (sic) terms of the agreements prohibit the Court from going beyond the contract.

Hearing transcript of April 12, 2000 at 13. Counsel for Southdown later states: "As I mentioned earlier, we submit that it's inappropriate to go beyond the terms of the contract." *Id.* at 16. In their brief submitted on their cross-motion for summary judgment (Aug. 15, 2000), the Southdown plaintiffs then argue that this court should look to the surrounding circumstances of the agreements to divine the meaning of

---

[15]*See National Union Fire Ins.*, 907 S.W.2d at 520 ("Parol evidence is not admissible for the purpose of creating an ambiguity").

"sole expense."[16] The Southdown plaintiffs state that Nortru has failed to show "sole"

actually means "sole" and not "solely others who signed the agreements." Southdown

argues that sole expense meant only as between them and Nortru and Allworth, the

signatories to the contracts in question.   Brief in support of plaintiffs' cross-motion

(Aug. 15, 2000) at 2.  Thus, Southdown concludes, this term must be ambiguous and

cannot be resolved on summary judgment.  *Id.* at 6-7.

This court can find no basis to consider the parol evidence submitted by the

plaintiffs in the form of affidavits of the attorneys who assisted in drafting the

agreements in question.  *See* brief in support of plaintiffs' cross-motion (Aug. 15,

2000) and  exhibits thereto.[17]  The affidavits in question are "the kind of self-serving

testimony that the extrinsic-ambiguity doctrine does not permit -- the uncorroborated

testimony of one of the parties about what he understood the contract to mean.  That

testimony does not become less self-serving by addition of a reason for the

understanding."  *PMC, Inc.*, 151 F.3d at 615.

---

[16]The court notes that these are not complex terms, rather, they are terms used in everyday language.

[17]Nortru argues that, at most, these affidavits establish that the Southdown plaintiffs introduced the term "sole" in to the Agreements and that no discussion of their interpretation of the term was undertaken.  Nortru's reply memorandum (Aug. 29, 2000) at 5.  This court is inclined to agree with this interpretation of the affidavits.  The court notes that as Southdown introduced the term now in dispute, the Restatement states that "in choosing among the reasonable meanings of ... a term, that meaning is generally preferred which operates against the party who supplies the words ..."  Restatement (Second) of the Law of Contracts (1979) § 206. *See* brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 2.

The plaintiffs have adamantly represented to this court that it may not go beyond the terms of the contract to glean what the parties may have intended by the term "sole expense." Applying Texas law, this court finds that these words are not ambiguous. As such, no parol evidence is needed and none shall be considered.

These affidavits also do not contribute to the circumstances existing at the time the contract was entered. Those circumstances include that the site was contaminated; that Southdown was aware of its liability for clean-up under CERCLA; and that Southdown wished to sell the site.[18] As such, the Southdown plaintiffs could have included language in the Agreements to explicitly preserve their rights to contribution under CERCLA as they were contracting to remediate the site at their sole expense, but did not. The Southdown plaintiffs have produced no evidence that "sole" meant anything other than its ordinary usage beyond conclusory allegations that they did not define the term "sole" to mean "by themselves." Even the plaintiffs' pleadings do not assist the plaintiffs. As stated above, in their pleadings they insist that the court

---

[18] The Court draws these circumstances from the following portions of the Remediation Agreement: The existence of the Remediation Agreement in and of itself demonstrates that the Southdown plaintiffs knew the site was contaminated. That Agreement states the steps Southdown must take when "SETS believes that it has completed the Work" and "SETS shall ensure that final remediation of the Contamination is completed to the satisfaction of the Agencies and shall obtain written confirmation from the Agencies that all requirements of the Plan or Plans have been met or satisfied." Remediation Agreement at ¶¶ 2.7(a); 2.7(c). The court finds these conditions of the Agreement only make sense if Southdown believed it had the obligation to remediate the site. Further, "contaminant" is defined within this Agreement as substances defined or listed as a hazardous waste under CERCLA. Remediation Agreement at ¶ 1.1(a). Hence, the Remediation Agreement demonstrates that the Southdown plaintiffs knew the clean-up of contamination was subject to and must comply with CERCLA. Obviously, the court draws the conclusion that the Southdown plaintiffs wished to sell the site from the Stock Purchase Agreement.

cannot look beyond the language of the contract.   Given the surrounding circumstances, this court can find no ambiguity in the term "sole."  Rather, the court finds that in including the term by which the Southdown plaintiffs accepted sole responsibility for cleaning up the site, the site became marketable, which it would not have been otherwise.[19]

Southdown argues it has not been paid enough money for the site to have agreed to shoulder all clean-up costs.  Plaintiffs' response (doc. 775) at 19.  The defendants argue that the plaintiffs have been paid more than a sufficient amount to bear such costs, and allowing a further recovery from other parties for the costs would result in the Southdown plaintiffs recovering twice.[20]  *See e.g.*, Listed Customer defendants' brief (Aug. 15, 2000) at 2-3.  The court does not find the price paid for the site to be persuasive of either argument, as trying to ascertain the value of the site without any contamination or the eventual total cost for complete remediation is beyond the scope of the pending motions.  *See e.g., PMC, Inc.*, 151 F.3d at 615 (stating that the court considering the price paid as evidence of including CERCLA liabilities would lead the court "on a wild goose chase").

---

[19]An agreement for the site owner/operator to remediate the site would be attractive to a purchaser as a guarantee that litigation exactly as that pending before this court would not occur.

[20]The court notes that Southdown recieved $1,050,000 in cash and a promissory note for $2,000,000 from Nortru.  Stock Purchase Agreement at ¶ 1.2.

The Southdown plaintiffs argue that their interpretation must be correct, otherwise unintended third party beneficiaries (Allen, the Listed Customer defendants and the other third party plaintiffs and defendants) would benefit. The Southdown plaintiffs argue that such a benefit would prevent the clause which states "nothing in this agreement, express or implied ... is intended to confer upon any person other than the parties hereto ... any rights, benefits or obligations hereunder..." from having any meaning, thus their interpretation must be correct. *See* Stock Purchase Agreement at ¶ 13.9; Remediation Agreement at ¶ 4.12, brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 11. However, under Texas law, no prohibition exists against an entity benefitting from a contract which it cannot enforce.[21] *MCI v. Texas Utilities*, 995 S.W.2d 647, 650-51 (Tex.1999). Thus, a party's intent not to confer a benefit upon a third party does not prohibit the same from occurring.

---

[21]The Southdown plaintiffs argue that "experienced parties ordinarily do not bind themselves to unreasonable obligations." *See* brief in support of plaintiffs' cross-motion at 19, citing *Amoco Production Co. v. Forest Oil Corp.*, 844 F.2d 251, 254 and n. 4 (5th Cir. 1988). However, the court notes in *Amoco*, the Fifth Circuit stated: "The 'sole cost, risk and expense' provision, standing alone, certainly does not identify specific costs or risks." *Id.* at fn 5. Here, the parties identified specific costs, namely those to remediate the site. *See e.g.*, Remediation Agreement at ¶ 2.1. The court again notes that the promise to remediate the site at its sole expense would be a valuable inducement to find a buyer for a contaminated toxic waste site given the current state of laws governing the clean-up of such contamination. Thus, the unreasonable obligation in this situation would be the purchase of such a site without a requirement that the seller would bear the cost of clean-up. The court notes that regardless of when the contamination occurred, Southdown could have required the same guarantee from Allworth in 1990 but A) chose not to and B) purchased the site with no prior testing. Therefore, this court finds Nortru's agreement to purchase the site on the condition that Southdown clean it up to be at a minimum, reasonable. In Allen's Response to Southdown's Response to the Court's Order of August 24, 2000, he phrases this same observation as "No sane person or company would purchase an existing, operating hazardous waste business knowing that its seller would immediately take steps to destroy that business, and, further, to embroil it in lengthy, expensive litigations." Allen's Response (Sept. 24, 2000) at 1-2.

Southdown also argues that if the parties intended to restrict Southdown's right to "contest and defend" relevant claims, they would have said so in the agreements. Brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 13. Nortru's assertion is that it never agreed to let Southdown destroy the business it purchased by suing all of its customers. The court finds this argument supported by the Noncompetition Covenant in the Stock Purchase Agreement, which states in relevant part "Sellers understand and acknowledge that a portion of the value of the Shares ... is attributable to business relationships between the Companies and key customers of the Companies and the willingness of Sellers to refrain from pursuing its relationships with those customers...." Stock Purchase Agreement, Art. XII. Southdown's argument that the Agreements do not prevent it from suing Nortru's customers is simply incompatible with the language of the Agreement seeking to protect the ongoing business relationship with these customers.

The benefit to third parties stemming from this condition of purchase (that Southdown remediate the site) is incidental to the guarantee any reasonable business entity would seek in a similar situation, that being to clean up the site in a manner that does not run off the customers or destroy the ongoing business. Because of the enormous benefit to Nortru which results from Southdown's promise to clean the site at its "sole expense," the court finds unconvincing Southdown's argument that such

interpretation mainly benefits third-parties.[22]   The main beneficiary of such a
guarantee is Nortru – the benefit to the customer defendants is incidental to the benefit
to Nortru.[23]

Further supporting the court's conclusion that what the parties intended at the
time of entering the Agreements was that Southdown would remediate the site at its
sole expense is the parenthetical language defining "expense," as well as the
remaining portion of the Remediation Agreement addressing known contaminants,
which states:

> SETS shall, at its sole expense (which expense shall include, but is not
> limited to, all costs relating to preparation of the Plan or Plans,
> responding to and compliance with any Order, the cost of all contractors
> to perform the Work or the requirements of the Plan or Plan or any Order
> and any costs assessed by any of the Agencies for oversight of the
> Work), remediate (i) all known Contamination located on the Real
> Property or on contiguous property where the source of Contamination
> is on or originated from the Real Property, and (ii) all previously
> unknown Contamination discovered on the Real Property, or on
> contiguous property not owned by Rho-chem or Allworth where the
> source of Contamination is on or originated from the Real Property ...

---

[22]Even more questionable is Southdown's argument that if Nortru's interpretation
of the Agreements is correct, Southdown could not pursue tort or contract actions against
its own contractors cleaning the site or seek insurance coverage for the clean up costs.
Brief in support of plaintiffs' cross-motion at 18-19.  This argument is unconvincing.
Each of the entities mentioned by Southdown in this preposterous example are agents of
the plaintiffs.

[23]The court finds much more troubling Southdown's claim for contribution and
cost recovery (discussed *infra*) against Allen.  The court also notes that to prevent their
intent from being misconstrued, the Southdown plaintiffs could have explicitly reserved
their rights to proceed under CERCLA against Allen, but chose not to.  Of course, their
claims for fraud and public nuisance survive the motions for summary judgment and the
court shall so order.

Remediation Agreement at ¶ 2.1. This court cannot imagine broader, more expansive language to state that the Southdown plaintiffs agreed to assume all costs for cleaning up the contamination on and off the property. A simple indemnification agreement whereby Southdown agreed to indemnify Nortru for any potential clean-up costs as an owner/operator would have accomplished what Southdown now says this language meant to say.

The language used in a contract should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. *Coastal Oil & Gas Corp. v. Roberts*, 2000 WL 1234379 (Tex.App. Aug. 31, 2000) at 4, citing *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). The court notes the numerous contracts to dispose of waste provided to the customers of the site require the Southdown plaintiffs and Allworth to indemnify those customers for liability arising from contamination of the Allworth site. Given these contracts, which existed before the Agreements with Nortru were entered, this court is further convinced that the reasonable interpretation of the language in the agreements is that "sole" means "sole."

*Black's Law Dictionary* defines "sole" as "single; individual; separate; the opposite of joint .... Comprising only one person; the opposite of aggregate.... Without another or others." *Black's Law Dictionary* 1391-1392 (6th ed. 1990). The court has

32

reviewed other sources as well, including *Webster's New Riverside University Dictionary* and *Words and Phrases*. This court is unable to locate a definition for the term "sole" where it is not limited to meaning "only one" without any type of limitation.[24] Southdown has not provided the court with any evidence that would give the term "sole" the meaning Southdown wants it to have. Further, in their second amended complaint, Southdown represented to this court that "SETS assumed all liability relating to soil and groundwater contamination at the site ... and entered into a Remediation Agreement pursuant to which SETS must, at its sole expense, remediate the contamination...." Second amended complaint at ¶ 69 (doc. 96). Southdown cannot both "assume all liability" as stated in their second amended complaint and have "sole" given the definition they desire.

The court is not able to find any basis for the proposition that "sole expense" is subject to more than one reasonable interpretation, thus creating an ambiguity. *See Gulf Metals Industries v. Chicago Insurance Co.,* 993 S.W.2d 800, 804 (Tex.App.1999). The court can see no barrier to a holding that "sole" does indeed mean "sole" in its everyday, ordinary meaning, although such construction may, incidentally, benefit a third party.

---

[24]Southdown refers to Nortru's insistence that "sole" means "to the exclusion of all others" as a "fixation," but fails to point to any definition of this term where "sole" has ever been taken to mean anything but this. *See* brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 6.

Because this court finds that the term "sole" as used in the agreements is not ambiguous, the court can determine the parties' rights and obligations under the agreement as a matter of law. This court holds, as a matter of law, that the term "sole expense" was intended to convey its ordinary meaning in the Agreements and therefore, the Southdown plaintiffs contracted to be solely liable for remediating the site. However, the inquiry does not end there, for the plaintiffs also argue that they have a right to contribution under CERCLA which they have not waived.

*"Sole" and CERCLA*

Southdown argues that sole cannot mean sole because they never intended to waive their contribution rights from other owner/operators and generators under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9615.[25]  In its memorandum, Nortru argues that rights to contribution under CERCLA are waivable by contract.  Memorandum of Nortru (Sept. 21, 2000) at 2, citing 42 U.S.C. § 9607(e). Southdown relies on the lack of explicit waiver language in the Agreements to support this argument.  The court

_____

[25]CERCLA § 107(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances ... at any facility." 42 U.S.C. § 9607(a)(3).  "Disposal" is defined as the discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ... hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3).  This definition is read broadly enough to include the subsequent movement and dispersal of hazardous substances within a facility.  *See Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1510 (11th Cir.1996); citing *Kaiser Aluminum and Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342 (9th Cir.1992).

finds from reviewing the same that in numerous places within the Remediation

Agreement, the Southdown plaintiffs could have stated they were not waiving their

CERCLA remedies.  The Remediation Agreement states, in relevant part:

> SETS shall, at its sole expense (which expense shall include, but is not
> limited to, all costs relating to preparation of the Plan or Plans,
> responding to and compliance with any Order, the cost of all contractors
> to perform the Work...) remediate (i) all known Contamination located
> on the Real Property or on contiguous property ... and (ii) all previously
> unknown Contamination discovered on the Real Property, or on
> contiguous property....

Remediation Agreement at ¶ 2.1.  Further:

> SETS shall have the right to control all Work to be performed under this
> Agreement and to negotiate with the relevant government authorities
> concerning the conduct of such Work.  Purchaser, Rho-Chem, and
> Allworth shall receive a reasonable opportunity to review, consult with
> SETS, and comment to SETS of SETS' choice contractors ... and
> conduct of all Work to be performed by SETS and its contractors
> pursuant to this Agreement ..., prior to any final decisions by SETS on
> such matters.

Remediation Agreement at ¶ 2.2.

> Purchaser ... shall be given reasonable notice of and will be given an
> opportunity to attend any such meetings with the Agencies and otherwise
> shall have the right to communicate or meet with the Agencies regarding
> regulatory matters.

Remediation Agreement at ¶ 2.3.  The court finds these paragraphs become

nonsensical if part of Southdown's plan for covering the costs of remediation includes

suing the current customers of the purchaser.  This is especially true in light of the following portion of the Agreement:

> 2.8 <u>Failure to Perform</u>: If SETS fails to perform or fails diligently to commence and pursue the Work in accordance with the Plans ... Purchaser may, after giving twenty (20) days written notice to SETS specifying the default ... and following any failure to cure such default, perform or cause to be performed such work, but SETS shall be solely responsible for and shall pay to Purchaser the amount of all reasonable costs associated with such work on a current basis.

Remediation Agreement at ¶ 2.8.  This paragraph only becomes logical if Southdown is to pay for all of the costs of remediating the site.  Otherwise, once again, Nortru would be presenting Southdown a bill knowing Southdown will sue Nortru's customers to pay for it.  This court does not believe this was the intent of the parties at the time this agreement was entered.

Adding yet further support to the court's opinion that Southdown being solely liable for the costs of the remediation was the true intent of the parties is paragraph 4.11 of the Remediation Agreement which states:

> This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and  supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations or other agreements among the parties in connection with the subject matter hereof except as set forth specifically herein or contemplated hereby. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by each party to be bound thereby....

Nowhere in the above paragraph does the language "except for Southdown's rights under CERCLA to sue generators of waste contributing to the contamination" appear.

Similarly, in the Stock Purchase Agreement, under "Representations and Warranties of the Seller," Southdown certifies "to the best knowledge of Sellers, there is no condition or set of facts or circumstances that is reasonably likely to give rise to an environmental lien or to Environmental Claims against the Companies." Stock Purchase Agreement at ¶ 3.22. "Environmental Claims" is then defined to include "any and all claims by a third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from a release of Hazardous Substances..." Stock Purchase Agreement at ¶ 3.22(e). This court cannot image Southdown certifying that there is no set of facts reasonably likely to give rise to environmental claims while intending to sue the customers of the site for contribution and cost recovery and at the same time contracting to indemnify and hold Nortru harmless from such claims. The only way the foregoing paragraphs can be read so as not to be meaningless is to take the term "sole expense" at its face value and assume Southdown meant it would pay for the remediation of the site on its own.[26]

---

[26]The only other feasible explanation that can make all parts of the Agreements make sense when read together is that Southdown had no intention of honoring any of the contracts at the time it entered them. The court is extremely hesitant to attribute such motive to any litigant.

Southdown argues they have indemnified Nortru and Allworth from "losses resulting from their performance or breach of the Remediation Agreement" and since they have undertaken remediation studies as a first step toward cleaning the contamination, Southdown is not in breach of the agreements.[27] *See* brief in support of plaintiffs' cross-motion at 4.

Of course, if Southdown had not sued Allen, it would not have to reimburse Nortru for Allen's claims for contribution. Given the relationship of the parties to this litigation, this court finds when the indemnification clause is considered in conjunction with the "sole expense" clause, the only logical construction is the one that appears on the face of the documents – that the Southdown plaintiffs agreed to clean up the site at their sole expense. Any other interpretation results in Southdown indemnifying Nortru for the very damages Southdown is causing by pursuing this litigation. Any recovery Southdown could receive from Allen would arguably have to be paid, at least in part, to Nortru because if Southdown has a right of contribution from Allen, then Allen should just as likely have one from Nortru, as the present owner of Allworth, which would cause Southdown to have to indemnify Nortru for the amount of Allen's recovery against Nortru, caused by Southdown itself. This

_____

[27]Nortru alerted Southdown in March, 1998 that it expected Southdown to defend and indemnify Nortru against Allen's cross-claims. The court notes that Southdown had not sued the Customer defendants at this time. *See* Exhibits D and E to memorandum in support of motion of Nortru (July 14, 2000), letter of Marlys Palumbo and Deborah S. Huston, dated March 8, 1998 and April 21, 1998.

further creates the interesting situation where Southdown, pursuant to the agreement, must step in and defend Nortru against Allen's third party suit, which would not exist but for Southdown's suit against Allen. *See* Stock Purchase Agreement at ¶¶ 11.3, 11.4. Hence, Southdown is, in essence, both the plaintiff and the third party defendant. This does not even begin to take into consideration the other indemnification agreements Allworth under its various owners has provided to the Customer defendants as a cost of doing business. When these are considered, Southdown could potentially have a duty to indemnify every party to this action, with the possible exception of Allen. *See* Attachment B to Customer defendants' counter and cross claims (doc. 394). While the Customer defendants argue that these indemnification agreements encompass the current litigation, the court does not reach that issue. *See* Customer defendants' reply (Sept. 25, 2000) at 4.

By entering into the Remediation Agreement and Stock Purchase Agreement with Nortru, the Southdown plaintiffs explicitly waived any rights they may have had to contribution under CERCLA. Applying the previous law and analysis, the court finds this interpretation of the Agreements to be supported by the "sole expense" language, especially given that no serious argument can be made that Nortru would

have purchased Allworth with knowledge of the contamination, without an agreement by Southdown to clean it up and to indemnify the purchaser.[28]

Further supporting this interpretation of the agreements is a consideration of Nortru's probable reaction if it had known then what it knows now: that Southdown claims "sole expense" means the right to seek contribution from its successor's past and present clientele which will have the possible result of driving its successor out of business. This court finds no credence in the suggestion that Nortru would have purchased the ongoing business had it known this is what Southdown would later claim to have intended.[29] The court finds its analysis supported by case law. For example, in *White Consolidated Industries, Inc., v. Westinghouse Electric Corp.*, 179 F.3d 403 (6th Cir. 1999), the court stated that "parties may contract to shift CERCLA liabilities by means of an assumption or indemnification agreement." *Id.* at 409, citing *Olin Corp. v. Yeargin, Inc.*, 146 F.3d 398, 407 (6th Cir. 1998). The court continued by stating that "a provision in an assumption agreement, 'which contains broad

---

[28]The court is again reminded that Southdown had little choice as they purchased their predecessor company and then sold the same to Nortru. Thus, in actuality, Southdown realized or should have realized at the time it sold the site to Nortru that if it wanted a purchaser, it would have to clean up the site. Southdown could have, but did not pursue site testing before it purchased the Allworth site.

[29]Rather, the ongoing customer relations with Allworth were part of the basis of the bargain when Nortru purchased the site. For example, in the Noncompetition Covenant, Southdown agreed "that a portion of the value of the Shares ... is attributable to business relationships between the Companies and key customers of the Companies and the willingness of Sellers to refrain from pursuing its relationships with those customers for a reasonable period following the Closing...." Stock Purchase Agreement, Art. XII.

language sufficient to indicate that the parties intended to include all liabilities, will include environmental liabilities as well even without specific reference to an environmental statute such as CERCLA.'"[30] *White Consolidated*, 179 F.3d at 409, citing *Olin Corp.*, 146 F.3d at 407.[31] *See also Joslyn Manufacturing Co. v. Koppers Company, Inc.*, 40 F.3d 750, 754-55 (5th Cir.1995) ("We hold that the indemnification agreements were intended to cover all forms of liability, including liability under CERCLA ... even though environmental liability under these statutes was not specifically contemplated at the time of contracting"). Thus, this court finds that

---

[30]Although *White Consolidated* discusses the assumption of CERCLA liabilities without a specific reference to CERCLA in the context of a purchaser's assumption of these liabilities, the court finds the legal basis for the Court's conclusion applies just as aptly in this situation, where the seller of the business agreed to assume these liabilities as a condition of the sale.

[31]The contract language in that case states:

> 9.1.5 All obligations and liabilities of the Business, contingent, or otherwise, which are not disclosed or known to Westinghouse on the Closing Date and are not discovered by WCI within a period of one year from the Closing Date.

*White Consolidated*, 179 F.3d at 409. The court notes this language is much broader than the language in question here:

> SETS shall, at its sole expense (which expense shall include, but is not limited to, all costs relating to preparation of the Plan or Plans, responding to and compliance with any Order, the cost of all contractors to perform the Work or the requirements of the Plan or Plan or any Order and any costs assessed by any of the Agencies for oversight of the Work), remediate (i) all known Contamination located on the Real Property or on contiguous property where the source of Contamination is on or originated from the Real Property, and (ii) all previously unknown Contamination discovered on the Real Property, or on contiguous property not owned by Rho-chem or Allworth where the source of Contamination is on or originated from the Real Property ...

Remediation Agreement at ¶ 2.1.

whatever right Southdown may have had under CERCLA to sue every entity that ever came near the site was absorbed by their own promise to remediate the site at their "sole expense." As such, this court finds that the Southdown plaintiffs do not retain the right to pursue under CERCLA that which they contracted away.

This court has considered Southdown's interpretation of the indemnity agreement contained in the Stock Purchase Agreement at ¶ 11.4. While this court does not have pending in front of it Southdown's argument that this agreement does not require Southdown to indemnify Nortru for their interference with business claims, the Stock Purchase Agreement states that if Nortru and/or Allworth are sued, Southdown may contest and defend claims where Nortru and/or Allworth demand indemnification under the Agreement. This includes, under the plain language of the Agreement, damages in any way relating to (1) any breach of the Agreement or (2) the site. *See* Agreement at ¶¶ 11.1, 11.2. *See also* ¶ 3.1. As succinctly put by the Customer defendants, "it is Southdown's initiation of this very litigation that has resulted and will result in the third party claims against Allworth – claims against which Southdown is obligated to defend and indemnify." Customer defendants' reply to plaintiffs' response (Sept. 25, 2000) at 2.

Nortru alerted the Southdown plaintiffs to its belief that Southdown's pursuit of this litigation was in breach of the Stock Purchase Agreement in June, 1998, where Nortru stated that:

> Southdown expressly agreed to remediate the facility at its sole expense and indemnify Nortru from any damages arising from the contamination of the facility as a condition of the purchase of the Allworth stock by Nortru. Claims against the facility's customers will be viewed as an effort by Southdown to circumvent its obligations under the Stock Purchase Agreement ... There can be little doubt that such claim will damage Allworth's relationship with these customers and be harmful to its ongoing business. Such potential claims are the direct result of the instant litigation instituted by Southdown and Nortru will likewise view any such claims as Southdown's responsibility.

Letter from Marlys Palumbo to Leslie White dated June 8, 1998, submitted as Exhibit C to brief in support of plaintiffs' cross-motion (Aug. 15, 2000).[32] The court further notes that this letter was written before any customer defendants were sued by Southdown in October, 1998.[33]

---

[32] The court notes that the plaintiffs both misquote this letter and take the desired language out of context. This letter also states "responsibility for this contamination is the central issue in the litigation between Southdown and Leslie Allen. While Nortru offers no opinion as to who bears the ultimate responsibility for the contamination at the facility as between Southdown and Mr. Allen, it clearly does not lie with Nortru. Rather, Nortru's involvement in the instant litigation is an artifact of the type claims Southdown elected to include in its Complaint ..." Letter from Palumbo to White date June 8, 1998, submitted as Exhibit C to brief in support of plaintiffs' cross-motion. Mr. Bullard's affidavit otherwise is misleading and incorrect. *See* brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 15; Affidavit of Bullard at ¶ 18, submitted as Exhibit 1 to brief in support of plaintiffs' cross-motion (Aug. 15, 2000).

[33] Nortru would not have suffered any harm until the customer defendants and it were brought into this litigation, more than a year after Southdown sued Allen.

The court does not delve into the myriad of indemnification agreements at this time as the court, based on the above findings of fact and conclusions of law, intends to dismiss the cross-claims for contribution against the third party defendants. The court does find that Nortru's claim against Southdown for tortious interference with its ongoing business relationships and its claim for indemnification on this issue, survive this order.

*CERCLA*

The Southdown plaintiffs bring CERCLA claims against Allen and the Listed Customer defendants under both § 107(a) for cost recovery and § 113(f), for contribution.[34]

Defendant Allen argues Southdown's undertaking is not within the term "response costs" under CERCLA because it stems from a contract obligation. To establish CERCLA liability, the plaintiffs must demonstrate that: (1) the site in question is a "facility"; (2) a release or threatened release of a hazardous substance

---

[34]The Eleventh Circuit has explained the difference between these two sections in the nature of liability imposed on the defendants. Under § 107(a), a defendant found liable to an innocent plaintiff is held jointly and severally liable to the plaintiff for all of the plaintiff's response costs. In contrast, under § 113(f), costs are allocated among the responsible parties, including the plaintiff. *See Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 fn.7 (11th Cir.1996). This distinction is crucial, because § 107 actions are subject to a six-year statute of limitations, 42 U.S.C. § 9613(g)(2), while § 113(f) actions are subject to a three-year statute of limitations, 42 U.S.C. § 9613(g)(3).

Southdown argues that it is innocent within the meaning because it did not contribute to the contamination. However, Southdown was in the business of owning and operating the site in question. Its representation to this court that it does not fall within the definition of "any person who at the time of disposal of any hazardous substance owned or operated the facility" is certainly questionable.

has occurred; (3) the release or threatened release has caused the plaintiffs to incur response costs consistent with the "national contingency plan"; and (4) the defendant is a "covered person" under § 107(a) of CERCLA.[35]  *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496-97 (11th Cir. 1996).  The first two elements and the last of this inquiry are not in dispute and will be assumed established by the court.[36]  The parties do argue over what caused the plaintiffs to undertake the response costs.

While Southdown argues that RCRA and CERCLA caused it to incur liability, the defendants, in all their current forms, argue that the Agreements signed by Southdown as a condition for Nortru to purchase the site caused the current liability and thus Southdown's undertaking of the remediation is solely voluntary, removing this case completely from CERCLA.  Evidence submitted by the Southdown plaintiffs themselves, as well as Southdown's pleadings, support this argument.  In their second amended complaint, the plaintiffs state that "On June 9, 1995, **pursuant to SETS' Remediation Agreement with Nortru, Inc.,** Southdown prepared a RCRA Facility

---

[35]Under § 107 of CERCLA, a "covered person" includes: (1) the owner and operator of the facility (Nortru and Allworth - clearly indemnified by Southdown); (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of (Southdown, Allworth and Allen); (3) any person, who by contract, agreement, or otherwise arranged for the disposal or treatment of hazardous substances at the facility (the Customer defendants); and (4) persons who transported hazardous substances to the facility.  *Redwing Carriers*, 94 F.3d at 1497, 42 U.S.C., 9607(a).

[36]Southdown is a past owner of the site during the time hazardous substances were disposed of at the facility.  See 42 U.S.C. § 9607(a)(2).

Investigation Work Plan (emphasis added)." Second amended complaint at ¶ 75. In

the Exponent reports submitted by the plaintiffs as Exhibits A and B to their response

(doc. 775), Exponent states:

> In April 1995, Southdown conveyed the facility to Nortru, Inc., but
> retained responsibility for remediating any contamination that occurred
> at the site before that time. Southdown's suit against Allen seeks
> recovery of costs incurred and to be incurred by Southdown in
> remediating contamination that occurred at the site before September
> 1990.

Exhibit A to Southdown's Response (doc. 775) at 1. The court finds that the "release

or threatened release" is not what caused the incurrence of response costs" by the

plaintiff, rather, the Remediation Agreement as part of the sale of Allworth to Nortru

caused the "response costs." *See Carson Harbor Village Ltd. v. Unocal Corp.*, 2000

WL 1290337 at 4 (9th Cir. Sept. 14, 2000) ("To the extent that these actions were

taken for purposes other than responding to an actual and real public health threat,

there is no CERCLA liability"). Thus, the plaintiff cannot establish a prima facie case

to maintain this litigation as a private-party lawsuit under CERCLA.[37] *See Dedham*

*Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, *aff'd after remand*, 972

F.2d 453 (1st Cir.1992); *Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. 1575

---

[37]The court does not mean to imply the contamination at the Allworth site does not
constitute an "actual and real public health threat." Rather, the court finds only that such
threat was not the impetus behind Southdown's undertaking the remediation. *But see
Carson Harbor. Ltd.*, 2000 WL 1290337 at 4.

(S.D.Ga. 1992); *3550 Stevens Creek Asso. v. Barclays Bank of Calif.*, 915 F.2d 1355 (9th Cir. 1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

The court also notes that in their Response to court's Order of August 24, 2000 (doc. 775), the plaintiffs argue that they are liable to clean up the site "[e]ven if there had been no Remediation Agreement.... That same liability remained with Southdown after Nortru purchased the facility.  To date, Southdown has been **compelled under RCRA's** corrective action regime to spend hundreds of thousands of dollars merely to investigate the nature and extent of the contamination to the satisfaction of the Alabama  Department  of  Environmental  Management  (emphasis  added)." Interestingly, plaintiffs cite to their second amended complaint to establish this claim. However, in their second amended complaint, the plaintiffs state that "On June 9, 1995, **pursuant to SETS' Remediation Agreement with Nortru, Inc.,** Southdown prepared a RCRA Facility Investigation Work Plan (emphasis added)."  Second amended complaint at ¶ 75.

In CERCLA litigation private parties may apportion costs between themselves, however, they may not shift any costs of clean-up to the government.  The cases cited by Southdown for this proposition do not take the extra step which Southdown needs – that parties to a contract cannot limit others' liability for clean-up of contamination by contract.  *See e.g., Kaufman and Broad-South Bay v. Unisys Corp.*, 822 F.Supp.

47

1468, 1473 (N.D.Cal.1993) (stating "private parties can enter into agreements between themselves to apportion responsibility as to each other for costs occurred under CERCLA. They cannot, however, alter their underlying responsibilities to the government to remediate contamination.");[38] *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 995 (6th Cir. 1993), cited by Southdown in its brief in support of plaintiff's cross-motion (Aug. 15, 2000) at 17. This line of cases does not help Southdown's argument that it only meant as between itself and Nortru, it would remediate the site after suing all of Nortru's customers.[39] None of these cases state that an agreement to shift costs for remediation purposes under CERCLA cannot incidentally benefit a third party. Rather, case law supports the contention that contracts releasing CERCLA liability must be construed under state law, here the law of Texas. *See Kaufman*, 822 F.Supp. at 1472-1473; citing *Mardan*, 804 F.2d at 1458-

---

[38]The court in Kaufman, quoting the Ninth Circuit, stated "since CERCLA releases are likely to be entered into major companies, there is little need for a special federal rule to protect releasers of CERCLA recovery rights from their own ignorance or weak bargaining power." *Kaufman*, 822 F.Supp. at 1473, quoting *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir. 1986).

[39]This court also finds Southdown's reliance on *CPC Int'l v. Aerojet Gen'l Corp.*, 777 F.Supp. 549, 565 (W.D.Mich.1991), misplaced. In that case, contribution plaintiffs had agreed to conduct remedial activities at their "sole cost and expense" as part of a consent decree with the Michigan Department of Natural Resources. Nothing in that case suggests that after so agreeing, that party sued other parties for contribution. Furthermore, the court notes that case has been affirmed in part, reversed in part and remanded by the Sixth Circuit (59 F.3d 584 (6th Cir.1995)), which then vacated that opinion (67 F.3d 586 (6th Cir. 1995),and issued a new opinion again affirming in part, reversing in part and remanding (113 F.3d 572 (6th cir. 1997)), certiorari was granted (522 U.S. 1024 (1997) and the opinion vacated and the case remanded (524 U.S. 51 (1998), at which point the Sixth Circuit issued another opinion (156 F.3d 1232 (6th Cir.1998)(unpublished)). This court is thus hesitant to rely on the District Court's opinion in that case.

59.  Under Texas contract law, an incidental benefit to a third party is not prohibited.

*See e.g.  MCI v. Texas Utilities*, 995 S.W.2d 647, 650-51 (Tex.1999) and discussion,

*infra*.

Southdown's argument that parties who perform remedial actions pursuant to

an agreement can bring an action for contribution is unsupported by the case they cite

for this proposition.  What the case actually states is:

> A party who has voluntarily agreed to perform certain actions pursuant
> to a **settlement agreement**, like CMP, is entitled to bring an action for
> contribution. *See Transtech Indus.*, 798 F.Supp. at 1086 (citing *Amoco
> Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989)). In a
> contribution action, the plaintiff must show, first, that the defendants are
> liable under § 9607(a); and then plaintiff may recover contribution from
> those found liable pursuant to § 9613(f)(1). *Transtech*, 798 F.Supp. at
> 1086 (emphasis added).

*Central Maine Power Co. v. F. J. O'Conner Co.*, 838 F.Supp. 641, 644-645 (D.Me.

1993).

Southdown argues that nothing in the Agreements it helped draft, wherein it

placed the "sole expense" language, which it signed and received money for should

be construed as limiting its CERCLA rights under both § 107, 42 U.S.C. § 9607 and

§ 113, 42 U.S.C. § 9613.  Southdown argues that it has the right under 42 U.S.C. §

9613 to bring claims for contribution against the customer defendants.[40]   The

---

[40]Southdown has not addressed the fact that it agreed to indemnify its customers against suit for this very situation as part of the business contracts with its customers. The court also notes that as Southdown purchased the Allworth stock, Southdown could feasibly be held to have agreed to indemnify Allworth's customers predating its purchase

Customer defendants respond that because Southdown has voluntarily agreed to clean up the site, it has no right to proceed under § 113, which requires a § 106 or § 107 enforcement action as a condition precedent to a § 113 contribution action.[41]  *See Aviall Services, Inc. v. Cooper Industries, Inc.,* 2000 WL 31730 (N.D.Tex. Jan. 13, 2000), citing *OHM Remediation Services v. Evan Cooperage Co., Inc.,* 116 F.3d 1574 (5th Cir.1997).  Thus, Customer defendants argue, because Southdown is not an innocent party as required under § 107, it cannot pursue an action under that section.[42]  Similarly, Allen's counterclaim under § 107 is not viable because he too is not an innocent party. *See* Customer defendants' reply (Sept. 25, 2000) at 8-9.  The court can find no case or statute that supports Southdown's argument in the face of a contract provision otherwise.

_____

of the site through successor liability.  The court finds this issue need not be addressed unless Southdown is found to have a right to pursue its § 113 claims under CERCLA.  This issue is not currently before the court except to the extent any right of Southdown is limited by the "sole expense" language in the Agreements.

[41]Plaintiffs argue in their response to the court's August 24, 2000 Order (doc. 775) that this court should disregard the *Aviall* case because it is "an unreported decision from another circuit."  Plaintiffs' response (doc. 775) at 11.  This court finds this to be a curious argument as the Agreements at issue, including the question of whether they require plaintiff to pursue the remediation at its sole expense, is governed by Texas law.  However, the court is mindful that this particular issue falls outside of the Agreements.  The court notes *Aviall Services* is in line with *Redwing Carriers* (which is undisputedly binding on this court), wherein the Eleventh Circuit states "[o]nce the district court determines who are the responsible parties under § 107(a), the next step under § 113(f) is to allocate responsibility among the parties." *Redwing Carries, Inc.,* 94 F.3d at 1514.

[42]The court is also mindful that both Southdown and Allen profited from operating the Allworth site.  They both accepted hazardous wastes for disposal in exchange for money.

Southdown states that courts will not find a party has waived its rights to contribution under CERCLA unless it has done so in clear and unambiguous terms, citing *Chemical Waste Management, Inc. v. Armstrong World Industries*, 669 F.Supp. 1285, 1290-91 (E.D.Pa. 1987). Brief in support of plaintiffs' cross-motion (Aug. 15, 2000) at 20. That case states "[d]efendants contend this 'language makes clear that the liability provisions of CERCLA do not abrogate contractual rights...' Although it is debatable whether any provision of CERCLA is 'clear,' the court agrees that in this private suit for response costs, CERCLA's liability provisions do not abrogate the parties' contractual rights." *Id* at 1293. The court notes that in *Chemical Waste*, the Court's statement that parties who wish to redistribute the risks distributed by Congress must do so clearly and unequivocally was made in the context of an argument of an implied indemnity agreement. *Id.* at 1294-1295. This court has no such implied agreement before it, but rather an explicit contract provision by which Southdown agreed to remediate the site at its sole expense.

Because of the court's above findings, the court does not entertain the parties' arguments as to whether Southdown can establish that the release of hazardous substances, and not the agreements, caused it to undertake the remediation now at issue, or whether for Southdown to be entitled to contribution under § 107 of

CERCLA, 42 U.S.C. 9607, it must be an innocent party to the contamination.[43]

Southdown's own liability is not currently before the court beyond that necessary to

consider the extent to which CERCLA impacts on the plaintiffs' ability to contract

away § 107 cost recovery or § 113 contribution claims.[44]

## CONCLUSION

Based on a consideration of the foregoing, the court is of the opinion that third

party defendants Nortru and Allworth are entitled to summary judgment on the issue

of the interpretation of "sole expense," the court finding that no genuine issue of

---

[43]The court does note that Southdown's failure to conduct appropriate inquiry into the condition of the site when it purchased the Allworth stock removes it from the stance of "innocent purchaser." *See* 42 U.S.C. §§ 9601(35)(A)(i), 9601(35)(B). *See also U.S. v. Serafini*, 791 F.Supp. 107 (M.D.Pa.1990), *aff'd* 135 F.3d 767 (3d Cir.1997). The best Southdown has been able to provide to this court is Exponent's reports, attached as Exhibits A and B to Plaintiffs' response (doc. 775). Southdown admits that these reports show that "the contamination *most likely* occurred before Southdown acquired the facility in 1990 (emphasis added)." Plaintiffs' response (doc. 775) at 3. The court notes on this issue that plaintiff may be able to establish it did not contribute to the contamination of the site. However, this issue arises in the context of a defense to Southdown's own liability, which is not currently before the court. *See Redwing Carriers, Inc.*, 94 F.3d at 1507; 42 U.S.C. § 9607(b)(3). The court realizes that full discovery has not yet been undertaken in this case and Southdown could feasibly prove that they did not contribute to the contamination at the site, although the lack of an appropriate study at the time of Southdown's purchase suggests otherwise.

[44]In this circuit, innocence is a prerequisite to a § 107(a) suit. *See Redwing Carriers, Inc.*, 94 F.3d at 1496. Given Southdown's potential liability for response costs, as yet undetermined by this court, Southdown's cost recovery action under § 107(a) may be barred. *See id.*, at 1512; citing *United Technologies Corp. v. Browning Ferris Indus.*, 33 F.3d 96, 99-100 (1st Cir.1994) cert denied 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994) ("Although it is possible that a private party may qualify as an 'innocent' plaintiff enabling it to bring a cost recovery action based on § 107(a) alone, the typical § 107(a) action is brought by a governmental plaintiff that has expended taxpayer dollars in cleaning up a facility"). *See also, In re Tutu Wells Contamination Litigation*, 994 F.Supp. 638 (D.Virgin Islands, 1998) (stating that cost recovery actions can only be brought by innocent parties who have undertaken clean-up, actions by potentially responsible parties are for contribution only). Hence, the court notes that the facts of this case likely involve one liable party suing another, thus removing this case as a cost-recovery action under § 107(a) and limiting it to a claim for contribution under § 113(f). *See Redwing Carriers, Inc.*, 94 F.3d at 1513.

material fact remains and that Nortru and Allworth are entitled to a judgment on this issue as a matter of law. Based on this ruling, the court finds the following pleadings, claims, counter-claims and cross-claims are due to be dismissed and shall so dismiss them by separate order:

1)  Counts I, II, III, IV, and V in the Southdown plaintiffs' second amended complaint of October 14, 1998 (doc. 96);

2)  Counts II, III, and "cross-claims against the forty-one customer defendants brought in by Southdown in its second amended complaint" in defendant Allen's answer, counterclaim, cross-claims and third party claims (doc. 108);

3)  Listed Customer defendants' counterclaims and cross-claims of February 1, 2000 (doc. 394);

4)  Defendant Steelcase Inc.'s third party complaint against Research Solvents and Chemicals (doc. 395);

5) Listed Customer defendant International Flavors and Fragrances, Inc.'s third party complaint against Potomac Environmental, Inc. (doc. 396);

6)  Listed Customer defendant Elf Atochem's notice of claim for indemnification against the Southdown plaintiffs (doc. 397);

7)  Listed Customer defendants' third party complaint against eleven third party defendants (doc. 398);

8)    Listed Customer defendants' amendment to the third party complaint adding Sirco Systems, LLC (doc. 399);

9) Third party defendants' cross-claims against the Southdown plaintiffs and defendant Allen adopting the Listed Customer defendants' Counterclaims/Cross-claims Against Owner/Operators For Indemnification and State Law Claims of Egyptian Lacquer Manufacturing (doc. 503), Plastech Engineered Products, Inc. (doc. 507); Brunswick Corporation (doc. 509); Tennessee Technical Coatings Corporation (doc. 512); Film Technologies International, Inc. (doc. 517); SCI Systems, Inc (doc. 561); Peek Pavement Marketing, Inc. (doc. 566); Lockheed Martin Corp. (doc. 568); Coronado Paint Company (doc. 569); International Comfort Products Corp. (doc. 570); ITT Industries (doc. 574); Marine Group LLC (doc. 575); Master Lock Co. (doc. 577); Sun Chemical Corp. (doc. 581); Mack Trucks, Inc. (doc. 586); Carboline Company fka Admiral Paint Co. (doc. 588); Kimoto Tech, Inc. (doc. 590); Alabama Power Company, Sony Magnetics Products, Inc. of America, Delta Airlines, Inc., Peerless Coatings, Inc. and SVI Corp. (doc. 592); Imperial Adhesives. Inc. (doc. 593); BASF Corporation (doc. 595); International Paint, Inc. (doc. 597); H.B. Williamson Co. (doc. 599); Research Solvents and Chemical Company, Inc. (doc. 600); General Electric Company (doc. 606); C.K. Witco, Inc. (doc. 607); Avecia, Inc. (doc. 608); Vermont American Corp. (doc. 609); Hess Oil Virgin Islands Corp. (doc.

610); JVC America, Inc. (doc. 614); The Kent Corp. (doc. 615); Thyssen Dover Elevator Co. (doc. 616); Sirco Systems, LLC (doc. 617); Copeland Corp. (doc. 619); Lucent Technologies, Inc. (doc. 629); Lawter International, Inc. (doc. 630); Rheem Manufacturing Co. (doc. 632); Freightliner Corp. (doc. 635); Decatur Aluminum Corp, (doc. 638); Phifer Wire Products, Inc. (doc. 639); Hager Hinge Company (doc. 644); Crownline Boats, Inc (doc. 645); Essilor of America, Inc. (doc. 650); MBCI d/b/a Metal Coaters of Georgia, Inc. (doc. 658); York Stamping d/b/a Wallace Metal Products (doc. 659); Kaiser Aluminum Corp. (doc. 665);

10) Third party defendant Automotive Moulding Company's cross-claims against the Southdown plaintiffs and defendants Allen, Nortru and Allworth (doc. 578);

11) Third party defendant Research Solvents and Chemicals, Inc.'s cross-claim against defendant Steelcase Inc., for indemnification (doc. 601);

12) Third party defendant Utility Trailer Manufacturing Co.'s counterclaims, cross-claims and other claims against the Southdown plaintiffs, defendants Allen, Nortru and Allworth (doc. 603);

13) Third party defendant Rehau, Inc.'s cross-claims (doc. 633);

14) Third party defendant Vulcan Industries, Inc.'s counterclaims, cross-claims and other claims (doc. 641);

15)   Third party defendant Spartan Electronic Florida, Inc.'s counterclaims against the Southdown plaintiffs and defendant Allen and cross-claims against third party defendant Hazardous Waste Consultants, Inc. (doc. 657); and

Claims and causes of action not set forth above shall continue in front of this court.  The sole remaining parties to this litigation are the Southdown plaintiffs, Allen and Nortru.  A status conference is set in this matter to assist in entering a new scheduling order for resolution of the remaining claims on **December 7, 2000, at 10:00 a.m. in Birmingham, Alabama**.

DONE and ORDERED this the _7_ day of November, 2000.


INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE